UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PADRAIC MCFREEN, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
|      vs. | ) Cause No. 1:14-cv-764-WTL-TAB |
| | ) |
| ALCATEL-LUCENT USA INC., | ) |
| | ) |
|    Defendant. | ) |

### ENTRY ON MOTION FOR PARTIAL SUMMARY JUDGMENT

This cause is before the Court on the motion of Defendant Alcatel-Lucent USA Inc. ("ALU") for partial summary judgment (Dkt. No. 35). The motion is fully briefed and the Court has heard oral argument regarding it. The Court, being duly advised, **GRANTS** the Defendant's motion for the reasons set forth below.

### I. APPLICABLE STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically

identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. **FACTS**

In a nutshell, Plaintiff Padraic McFreen alleges in this case that Lucent Technologies, Inc. ("LTI")[1] used for its own benefit confidential information and trade secrets that he revealed to LTI and that in so doing LTI violated the parties' mutual nondisclosure agreement and the California Uniform Trade Secrets Act. While McFreen asserts numerous ways in which he alleges LTI misappropriated his confidential information, the instant motion involves just one: McFreen's allegation that his confidential information made its way from LTI to SBC Communications ("SBC"), which then used the information in what became AT&T's U-Verse internet-based entertainment system.[2]

The relevant facts of record can be divided into two distinct categories: (1) background facts that explain the relationship between McFreen and LTI; and (2) facts that relate to the development of AT&T's U-Verse product. This fact section contains those facts of record, viewed in the light most favorable to the Plaintiff, as the non-moving party, that are necessary to give the reader the necessary context for the Court's discussion of the issues. Additional facts are included where relevant in the discussion section.

### A. **Background Facts**

In 2017, the ability to access various forms of entertainment over the internet whenever the mood strikes is an integral part of daily life for many consumers. That was not the case in

---

[1] LTI merged with Alcatel in 2006 to create ALU.
[2] SBC became known as AT&T in 2005.

2000, however; at that time, there was no technology in place to allow consumers to seamlessly access and stream video and audio over their televisions and other devices. In approximately 1998, Plaintiff Padraic McFreen "conceived of and began developing a concept for an Internet Protocol ("IP") lifestyle multimedia and entertainment network for the delivery of an Internet-based system that aggregated, bundled, and distributed a wide range of personalized entertainment products and services, enabled by the public use of the Internet as a network and to be provided, as a service for a fee ("Network as a Service" or "NaaS"), to Internet Service Providers ("ISPs") through a single Internet-based conduit or portal," a concept that was "revolutionary" at the time. Dkt. No. 54 at 2-3. McFreen called his "platform, product, services, and content marketplace" MiVu, which stands for Multiservices Internet Virtual Universe and which represents "McFreen's purpose for his platform, product and services: To create a uniquely personalized experience. MiVu's market positioning statement exemplified this purpose: 'All things important to me and my life right here (within arms' reach) . . . my view of the world.'" *Id.* at 3.

In 2000, McFreen contacted LTI to inquire about purchasing a switch that he needed to build the MiVu network. McFreen was put in touch with LTI employee Nathan Geesey, who worked at LTI's Overland Park, Kansas, office. After McFreen had several conversations with Geesey and others from LTI, Geesey suggested that McFreen and LTI execute a Mutual Nondisclosure Agreement ("NDA"), which they did on October 18, 2000. The NDA provided that the confidential information provided to LTI by McFreen would be used "solely for the planning, design and implementation of the MiVu concept." The confidential information to be provided was described in the NDA as "Multiservices containing Internet Radio, Interactive Television, Gaming, Digital Chat Rooms, Video on Demand, Major Feature Films, and

Broadcast Video and Audio Services." *Id.* at 6.  McFreen was given "a dedicated area for the development of MiVu in the LTI office [in Overland Park] and left documents, pictures, drawings, and files materials [sic] in a cubicle." *Id.* at 7.  In meetings both in person and over the phone, McFreen "shared with LTI the conceptual, branding, and technological details of the bundled services IP platform he had developed." *Id.*

After working closely with LTI engineers and other personnel "with the shared goal of bringing the MiVu concept to market," *id.* at 9, culminating in January 2001 in a plan to conduct a feasibility study, McFreen ultimately was notified by LTI on or about February 15, 2001, that "senior stakeholders within [LTI] having reached a decision of 'hold' on the MiVu project due to unplanned internal financial developments and a significant lack of confidence in the feasibility of the MiVu network and associated ISP services, [LTI] would no longer supply financing in support of the project." *Id.* at 17.  After some additional back and forth between McFreen and LTI, the parties ended their business relationship in April 2001.

McFreen's NDA with LTI expired on October 18, 2005; after that date, LTI was free to disclose any information that it received from McFreen.

## B. Facts Relating to AT&T U-Verse[3]

Project Lightspeed was SBC's internal code name for a broadband project that would use SBC's fiber optic network and FTTN (fiber-to-the-node) technology to deliver voice, video, and Internet services. The commercial name for Project Lightspeed was U-Verse.  Before 2005, Alcatel demonstrated to SBC a working model of a system that delivered voice, video, and high-

---

[3]Some of these facts are taken from the Defendant's Statement of Material Facts Not in Dispute (Dkt. No. 36 at 11-12).  As the Defendant correctly notes in its reply brief, the Plaintiff does not directly dispute the truth of any of these facts.  The remainder of these facts are taken from McFreen's Statement of Material Facts in Dispute.

speed Internet over an FTTN network that it had developed. Alcatel was chosen by SBC as the primary contractor for SBC's Project Lightspeed/U-Verse. As the primary contractor, Alcatel developed the technical solutions for implementing the voice, video, and Internet systems for U-Verse and provided many of the hardware components used in the Project Lightspeed/U-Verse system.

At the time that Alcatel was working on the engineering and design solutions for Project Lightspeed/U-Verse, LTI and Alcatel were direct competitors and rivals in certain segments of the telecommunications equipment industry. LTI had no involvement with Project Lightspeed/U-Verse before 2005. LTI played no role in developing any of the technology solutions that allowed SBC to develop and launch U-Verse with its "triple play" package of voice, video, and high-speed Internet services over an FTTN network. By the time LTI had any involvement with Project Lightspeed/U-Verse, all of the core components of the U-Verse system had been developed and tested.

In a 2004 conference call, SBC stated: "The true competitive differentiator [of Project Lightspeed] is the integration of voice, video and data, made possible by an IP network. This means our customers will have more convenience and more control. For example, customers will have content at their fingertips. A person watching a TV show that asks audience members to vote for contestants can do so directly from their TV and instant message their friends from the same device." Dkt. No. 54-23 at 5. In a February 1, 2005, presentation regarding Project Lightspeed, SBC's Vice President of Product and Strategy Jeff Weber stated that SBC's mission was to "grow by offering the most complete, flexible bundle of high quality communications solutions in the market, at a great value . . . continually introduce new opportunities to meet and exceed the service and experience our customers demand . . . know our customers and offer a

personalized service tailored to their needs." Dkt. No. 54-21 at 4. Weber's presentation listed as some of the advantages of the SBC Video Platform the "[a]bility to offer many traditional channels as well as new content including gaming, music, video on demand, and interactive applications;" the fact that the "IP platform provides flexibility in developing the user interface and allows for highly customizable user experience;" and the "[a]bility to track and report detailed subscriber and usage metrics in near real time for broadcast channels and interactive services." Dkt. No. 54-22 at 2.

    LTI became involved with Project Lightspeed/U-Verse in August 2005 when it executed a Letter of Agreement with SBC that added LTI to a non-disclosure agreement that was executed by vendors who were to be "Lightspeed Suppliers." On October 11, 2005, SBC and LTI executed a contract involving the use by SBC of a technology platform that LTI had developed called IMS (IP Multimedia Subsystem). IMS could be used for transmitting voice signals over an internet protocol known as VoIP. LTI introduced IMS as "an IP-based multimedia and telephony core network that enables two-way voice, data, and video across multiple access technologies and devices, at the high quality and reliability expected by an end-user today." Dkt. No. 54-10 at 6. IMS used the same framework for any kind of access (wireless or wireline) and any kind of traffic—VoIP, data, multimedia. IMS was touted as "cost-effectively enabling service providers to offer blended services, positioning the operator to 'own' the subscriber regardless of how they access the network." *Id.*

    On October 18, 2005, the day McFreen's NDA with LTI expired, SBC issued a press release announcing its selection of LTI's "comprehensive" IMS platform to "help SBC integrate wireline and wireless services in new and powerful ways, and deliver anytime, anywhere access to a 'grand slam' of next-generation Internet Protocol (IP)-based services—both wireline and

6

wireless voice, high-speed Internet access and video." Dkt. No. 54-20 at 2. SBC expected to begin introducing services enabled by the IMS platform in "late 2006 or early 2007." *Id.* SBC reported it would "deliver innovative new IP applications on subscribers' wireline and mobile devices." SBC Senior Executive Vice President-Chief Technology Officer John Stankey was quoted as stating, "This agreement is a significant step in SBC's continuing effort to build solutions around consumers' lifestyles." *Id.*

### III.  DISCUSSION

ALU's position is simple—LTI was not involved in the development of U-Verse; rather, U-Verse was developed by SBC in conjunction with Alcatel, which at the time was a competitor of LTI. The issue raised in the motion is a narrow one: whether McFreen can point to evidence from which a reasonable jury could determine that confidential information that he disclosed to LTI made its way from LTI to SBC and was used in the development of U-Verse.

In his brief in response to the instant motion, McFreen first argues generally that "[t]he fact-intensive nature of this case, and of the issues present [sic] in ALU's motion in particular, make it an especially poor candidate for resolution on summary judgment." Dkt. No. 54. Presumably to underscore this point, McFreen includes approximately 26 pages of "Material Facts in Dispute" in his brief. In reality, many of those facts are not in dispute, at least for purposes of the instant motion. And most of them are not material to the narrow issue raised by the motion, as they have no bearing on the question of how confidential information McFreen communicated to LTI could have made its way to SBC's U-Verse. In any event, the fact that a case is "fact-intensive" does not, by itself, make summary judgment improper. Rather, Federal Rule of Civil Procedure 56(a) makes it the Court's duty to review the properly supported facts of record and enter summary judgment on any claim as to which there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law.  The mandatory language of Rule 56(a) does not give a court the option of declaring something "fact-intensive" and leaving it up to a jury to sort out, and fact-intensive issues regularly are resolved on summary judgment.  *Cf. Blanchar v. Standard Ins. Co.*, 736 F.3d 753, 756 (7th Cir. 2013) (affirming summary judgment in FLSA after noting that "[t]he evaluation of a FLSA claim requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities.") (citation omitted); *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009) ("And though the decision whether to disregard the corporate form to impose liability is fact-intensive, *see Freeland v. Enodis Corp.,* 540 F.3d 721, 739 (7th Cir. 2008), here the material facts are not in dispute, making resolution on summary judgment appropriate.").

It is the duty of the non-moving party to present the material facts in an orderly way and specifically identify for the court what genuine, material factual disputes exist.  This is true even (perhaps especially) when "fact-intensive" issues are involved.  *See, e.g.*, *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543-44 (7th Cir. 2011) ("As we have previously stated, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes.") (internal quotation marks and citations omitted).  In his brief, McFreen points to facts that he says support a finding that "nearly from the beginning of their work, LTI was willing to co-opt Mr. McFreen's ideas and trade secrets and claim them as his own" and "create a genuine issue of material fact as to its liability for violating the NDA and taking plaintiff's trade secrets."  Dkt. No. 54 at 31, 32. But ALU does not assert that there are no genuine issues of fact with regard to the broad issue of whether LTI improperly used McFreen's confidential information in some way; it has not moved

for summary judgment on that broad issue. With regard to the narrow issue raised by the instant motion, McFreen's brief points to only a few facts.

First, McFreen points to the fact that in May 2001, LTI and Alcatel held unsuccessful merger negotiations. McFreen argues that "[s]uch discussions would necessarily encompass emerging technologies such as multimedia bundling. Even at a high level, it is reasonable to infer that the companies would discuss new markets and technologies such as Mr. McFreen's paradigm for multimedia bundling." Dkt. No. 54 at 33. In other words, he argues that the jury reasonably could conclude that LTI gave McFreen's confidential information to Alcatel during their unsuccessful merger talks and Alcatel used that information to develop U-Verse. The Court disagrees that it would be reasonable to infer simply from the fact that merger talks occurred that any particular piece of confidential information was discussed during those talks.

McFreen does not rely solely on a pathway through Alcatel, however. He also argues that there is sufficient evidence to support a finding that LTI provided his confidential information directly to SBC. In his brief, McFreen argues:

> The timeline of relevant action includes ALU's concession that LTI signed a contract on October 11, 2005—within the effective term of Mr. McFreen's NDA—with SBC for IMS technology. (Bomba Declaration, para. 7.) This IMS technology was directly related to U-verse implementation. (Pickett Declaration, para. 35.) This was the culmination of discussions that began on August 25, 2005, between SBC and LTI in which LTI became a "Lightspeed Supplier." (Bomba Declaration, para. 9.) LTI's implementation of these technologies necessarily included trade secrets derived from Mr. McFreen's work.
>
> The ultimate timing of LTI's announcement of bundled multimedia services cannot be ignored. Mr. McFreen's NDA with LTI expired on October 18, 2005. On that very same day, SBC Communications announced that it selected LTI's services to "integrate IP voice, video, and data services" as part of its Project Lightspeed. This bundling of voice, video, and data services is exactly what Mr. McFreen pursued in meetings with LTI in 2000-2001. By that time, LTI was a "Lightspeed Supplier" for technology derived from Mr. McFreen's trade secrets.
>
> In support of summary judgment, ALU presents third-party materials from

> 2003-2005. (Motion for Partial Summary Judgment, Exhibits 2-7.) These limited articles present a constrained view of the broad array of technology that was necessary to bring U-verse to market. Unlike ALU's materials, Plaintiff's declaration and supporting material reveals the links between LTI and SBC. As important, Mr. McFreen's presentation of materials to LTI provided the necessary framework for proper implementation of U-verse, regardless whether SBC chose Alcatel or LTI products.

Dkt. No. 54 at 32-33.

The problem with this argument is that it fails to point to any evidence that LTI contributed anything to the development of the concept of U-Verse, and it is the *concept* that McFreen identifies as his trade secret. Indeed, McFreen's counsel confirmed that fact in response to the Court's questioning during oral argument:

> [W]hen Mr. McFreen talks about his innovation, his trade secrets, what he speaks of is a lifestyle entertainment network with a number of specific components which collectively are unique and different and make it a trade secret as a collective network or system.
>
> What he envisioned in 2000 and 2001 was a new entertainment network using the Internet as the infrastructure for it, which was not previously a part, using fiber to the node as the method by which connections would be made into neighborhoods that would allow the transmission of video and lots of other things that he envisions.
>
> He includes within his concept a variety of other markers, which I'm going to talk about this morning, that collectively create a new concept for a business and a business plan as a part of what [his expert witness] identifies as his trade secrets, a business plan which U-verse comprises a significant part of. That is, it is, in essence, a lifestyle entertainment network.

*See* Dkt. No. 124 at 5-6. This is entirely consistent with McFreen's brief, in which he argues repeatedly that Project Lightspeed/U-Verse, as a whole, is the embodiment of the confidential information he shared with LTI. *See, e.g.*, *id.* at 27 ("SBC's claims and strategy are virtually identical to the features and benefits of Mr. McFreen's proposed MiVu Network and associated ISP services."); *id.* at 28 ("SBC's claims are the same as those made by Mr. McFreen about his

10

proposed MiVu Network."); *id.* ("SBC's network scheme is identical to the one described by Mr. McFreen to LTI for the proposed MiVu Network.").

But even assuming, as ALU does for purposes of the instant motion, that the concept of U-Verse came from McFreen, there is simply no evidence that it made its way to SBC via LTI. McFreen himself cites to documents in which SBC described, in detail, its Project Lightspeed and the concept that he claims is identical to his own idea in November 2004 and February 2005, well before the August 2005 discussions between SBC and LTI that led to LTI becoming involved with Project Lightspeed/U-Verse. See Dkt. Nos. 54-21, 54-22, and 54-23. McFreen has not refuted the evidence provided by ALU that prior to August 2005, "all the core components of the Project Lightspeed/U-Verse system had been developed and tested and IMS was not part of that system." Dkt. No. 36-1 at 7 (Pickett Declaration ¶ 38).[4]

McFreen points to three connections between LTI and SBC prior to August 2005: (1) a 2000 contract between the two companies that "set forth the basic underlying terms that would apply to future contracts between LTI and SBC," Dkt. No. 54 at 25; (2) a 1997 "strategic sales pact" pursuant to which Southwestern Bell would "sell Lucent business products in its traditional five state region of Arkansas, Kansas, Missouri, Oklahoma and Texas," Dkt. No. 72-5; and (3) an October 5, 2000, announcement that LTI was selected by SBC to be its "primary provider of data, voice, and access infrastructure technology for its national network expansion," Dkt. No. 72-6. The fact that the two companies did business together over the years in various areas in no way supports a finding that LTI provided any information to SBC relating to Project

---

[4] McFreen's Statement of Material Facts in Dispute contains the statement: "SBC's 'Grand Slam' bundled services were initially field tested under the code name 'SBC Project Lightspeed,' through which it tested Video (IPTV), Voice and Data delivery to the end-customer using Lucent's MiLife Solutions, Lucent's IMS, Lucent's OPI-DSLAM and Lucent VDSL." No evidence is cited for this assertion, however.

Lightspeed/U-Verse prior to August 2005. McFreen has pointed to no evidence that the people involved with that business at LTI were privy to McFreen's confidential information, nor has he pointed to any evidence that the people involved with that business at SBC were involved in Project Lightspeed in any way. It simply is not reasonable to deduce from the fact that two large companies did some business together that they also collaborated on other aspects of their businesses.

Finally, McFreen argues that "[t]here is also strong circumstantial evidence in the numerous similarities between the features of the SBC U-verse system and the confidential information provided by Mr. McFreen and[5] LTI. The similarities alone provide a basis for inferring that there must have been a path." Dkt. No. 54 at 34. This is simply incorrect, as McFreen has submitted no evidence that no company or person other than LTI had access to McFreen's confidential information such that the only possible pathway to SBC was through LTI.

## IV. CONCLUSION

McFreen has not pointed to evidence from which a reasonable juror could conclude that his confidential information was provided to SBC from LTI and used by SBC to develop what became AT&T U-Verse. Accordingly, ALU's motion for partial summary judgment on that issue (Dkt. No. 35) is **GRANTED**. In addition, as acknowledged by the parties during oral argument, the Defendant's motion for sanctions (Dkt. No. 73) and Motion to Bar Mr. McFreen from Relying Upon Certain Documents (Dkt. No. 97) were mooted by the extension of the discovery deadline in this case, and accordingly those motions are **DENIED AS MOOT**, as is a

---

[5]The Court suspects that McFreen means "to," rather than "and."

related motion to file a surreply (Dkt. No. 90).  The remaining pending motions will be resolved in due course.

    SO ORDERED: 3/23/17

*William T. Lawrence*

                                        Hon. William T. Lawrence, Judge
                                        United States District Court
                                        Southern District of Indiana

Copies to all counsel of record via electronic notification